UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                                    :
INTERNATIONAL BROTHERHOOD          :          CASE NO. 5:05-CV-2780
OF ELECTRICAL WORKERS                    :
LOCAL 1985,                                          :          JUDGE JAMES S. GWIN
                                                    :
                    Plaintiff,                      :
                                                    :
vs.                                                 :          ORDER & OPINION
                                                    :          [Resolving Doc. Nos. 15, 17]
THE HOOVER COMPANY, a division of  :
MAYTAG CORPORATION                       :
                                                    :
                    Defendant.                     :
                                                    :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On December 1, 2005, Plaintiff International Brotherhood of Electrical Workers Local 1985 ("Local 1985") filed suit against Defendant Hoover Company ("Hoover"), seeking vacation of an arbitration award rendered on November 21, 2005. The parties have filed cross motions for summary judgment. [Doc. Nos. 15, 17]. For the reasons set forth below, and because this Court affords great deference to contractually agreed upon arbitration, this Court **CONFIRMS** the arbitration opinion and award.

## I. BACKGROUND

The Hoover Company and the International Brotherhood of Electrical Workers Local 1985 dispute whether Hoover can, under the parties' collective bargaining relationship, relocate the production of the "Eagle Steam Vac" product line from the North Canton, Ohio to facilities in El Paso, Texas and Juarez, Mexico.

-1-

Case No. 05-CV-2780
Gwin, J.

The Hoover Company started in Canton, Ohio nearly 100 years ago.  Since that time, the company has continued to produce many of its floor care products, including vacuums, upright steam vacuum extractors, and related accessories in North Canton, Ohio.  Extremely successful and innovative both in product design and manufacturing, the Hoover Company employed workers at wages that allowed a middle-class lifestyle while Hoover made outsized contributions to the profits of Maytag, its corporate owner.  Only when the sharp purchasing power of Wal-Mart transformed the floor care products market to a market dominated by one, did Hoover need to consider lowering quality and price by moving production away from its highly efficient Ohio facilities.

At the time the instant dispute arose, the company employed about 1200 employees at its North Canton location, including roughly 1000 hourly bargaining unit employees.  Plaintiff Local 1985 serves as the certified bargaining representative for most of those employees.  Local 1985 claims that Hoover's decision to relocate production of the Eagle line to its Southwest facilities violates the terms of the parties' current collective bargaining agreement ("CBA").[1]

In collective bargaining that began in the 1980s, the background of the current dispute took shape.  Around that time, Hoover opened a production facility in Juarez, Mexico.  By 1988 and likely in reaction the exportation of Hoover jobs to Juarez, Local 1985 emphasized negotiations for greater job security.

In the years that followed, Hoover and Local 1985 focused their negotiations on a concept of product-line job security.  In 1988, the parties agreed upon a mid-term supplement to the CBA – Memorandum Agreement 1, Exhibit 28, Job Security" ("Job Security Agreement").  With that Agreement, Hoover agreed to maintain production of certain product lines at the North Canton

---

[1] The current CBA is will expire in 2008.

Case No. 05-CV-2780
Gwin, J.

facilities.  The parties extended this guarantee over the next three CBA negotiation sessions,
including the 2000 session.

When negotiating the terms of the CBA for the 2000-2005 period, the parties once again
amended the Job Security Agreement, but again adhered to the practice of designating certain
product lines for production in North Canton.  The union and the company did not guarantee any
numerical level of employment, only that certain products would be produced in North Canton.  In
these negotiations, Hoover and Local 1985 specifically listed the Steam Vac among the protected
product lines.  The agreement also stated that "During the term of this Agreement, The Hoover
Company at its Stark County, Ohio, facilities will retain the production of future upright carpet
extractors built on a Steam Vac chassis.  Furthermore, during the term of this Agreement, if The
Hoover Company introduces for production a subsequent version of an upright carpet extractor, The
Hoover Company Stark County facilities will retain the production of such product." (Memorandum
Agreement 1, Exhibit 28, June 10, 2000, Joint Ex. 7 at 750.)

The following year, in 2001, Hoover approached Local 1985 about the newly developed
Eagle Steam Vac product line.  In approaching Local 1985 during the term of the 2000-2005
collective bargaining agreement, Hoover sought to negotiate changes to the existing agreement.
During the 2001 negotiations, the parties negotiated another supplemental agreement – the May 16,
2001, Letter of Understanding.  Under this Letter of Understanding, Hoover agreed to add the Eagle
Steam Vac to the list of protected products in the Job Security Agreement.  Specifically, the Letter
of Understanding stated the following terms:

1.    The Hoover Company commits that the assembly and major molding of parts
      for Eagle I and Eagle II will be at the Stark County facilities.

-3-

Case No. 05-CV-2780
Gwin, J.

2.     The Hoover Company will first consider producing motors, cords, and sub-assemblies for Eagle I and Eagle II at the Stark County facilities where economically feasible.

3.     The Hoover Company will commit the production of Eagle I and Eagle II to Memorandum Agreement 1, Exhibit 28, Job Security.

4.     The Hoover Company will determine which product returns come back to the Stark County facilities.  The Company will have the right to dispose of or refurbish product returns as they deem necessary.

5.     The Central Vac will be shut down and contracted to a third party who will produce Central Vac's under The Hoover Company name.

6.     The Hoover Company may relocate to the Southwest the assembly of hardware packs that are currently sent from Stark County to those facilities.

7.     The special belt/bag display packs currently produced at Plant 2 may be produced at sheltered workshop.

(Letter of Understanding, May 16, 2001, Union Ex. A at 807.)

In September 2003, the parties once again reopened the 2000-2005 CBA for mid-term negotiations.  After extensive negotiations, the parties reached an agreement ("2003 Contract Settlement") on December 1, 2003.  The 2003 Contract Settlement lists the changes that the parties agreed to make to the 2000-2005 CBA.  The parties explicitly included revisions to the Job Security Agreement in this list of changes to the 2000-2005 CBA.  The 2003 Contract Settlement also states, in relevant part, "representatives of I.B.E.W. Local No. 1985 and The Hoover Company have agreed to and recommend the following changes and amendments to the basic Labor Agreement dated June 5, 2000 . . ..  All other provisions of the June 5, 2000 Labor Agreement remain in force."  (Joint Ex. 9 at 756.)

With regard to the revision of the Job Security Agreement, the parties negotiated for Hoover's commitment to maintain a minimum number of employees, rather than for a continued

-4-

Case No. 05-CV-2780
Gwin, J.

commitment to produce specific product lines in North Canton.  By the conclusion of negotiations, the parties agreed upon a significantly different concept of job security.  Unlike prior versions of the Job Security Agreement, the 2003 version did not explicitly require Hoover to continue the production of any specific product lines in North Canton.  Instead, the 2003 version contains a guarantee that Hoover would maintain a minimum number of bargaining unit jobs at the North Canton facilities during the term of the contract.  Importantly, the agreement also states:

> It is further agreed that the Company may discontinue products, parts, and processes, purchase from outside vendors products, or parts, or may transfer the manufacturing of products, parts, and sub-assemblies between its production facilities and/or certified suppliers provided the minimum guarantee of bargaining unit jobs is met.

(Memorandum Agreement 1, Exhibit 28, Job Security Dec. 1, 2003, Joint Ex. 9 at 761.)

 In 2004, Hoover's parent company, Maytag Corporation, initiated a study to analyze the floor care industry and to determine how Hoover could reduce its costs.  The research group recommended that Hoover relocate production of the Eagle Steam Vac line to the company's Southwest facilities.  After receiving the report, Hoover consulted the union, and the parties attempted to negotiate different cost-saving solutions but were unable to agree upon a viable alternative.  Hoover then notified Local 1985 of its final decision to move the Eagle production and assembly line to El Paso, Texas and Juarez, Mexico. Shortly thereafter,  Local 1985 filed a grievance on behalf of the affected employees, arguing that the relocation violated the 2003-2008 CBA.

On June 3, 2005, during negotiations, Local 1985 filed a grievance on behalf of the affected employees, arguing that the relocation violated the 2003-2008 CBA.  In the grievance, Local 1985 specifically cited the May 16, 2001, Letter of Understanding as a controlling document.  Hoover denied the grievance, saying that the grievance was not ripe because the parties were still in joint

-5-

Case No. 05-CV-2780
Gwin, J.

discussions regarding the possible relocation.

In a letter dated July 8, 2005, Hoover announced a final decision to move the Eagle production and assembly line to El Paso, Texas and Juarez, Mexico. On July 21, 2005, Local 1985 filed a second grievance. The parties agreed to merge this grievance with the June 3 grievance and submit them to arbitration before Arbitrator Paul F. Gerhart.

Arbitrator Gerhart conducted hearings and received testimony on October 11 and 12, 2005. At those hearings, Hoover questioned whether the grievance was arbitrable. For the purpose of going forward with the hearing Hoover stipulated that the grievance was properly before the arbitrator but reserved the right to raise the issue of arbitrability in its post-hearing brief.

On November 21, 2005, Arbitrator Gerhart denied Local 1985's grievance. After finding the issue to be arbitrable, the arbitrator determined that the language in the revised 2003 Job Security Agreement granting the company the right to transfer the production of any product lines was controlling. According to the arbitrator, the parties' agreement to substantially revise the Job Security Agreement – changing it from an agreement to continue producing certain product lines in North Canton to an agreement to maintain a certain number of employees at the Canton facilities – was overwhelming evidence of the parties' intent to remove any previous obligation that the company had regarding the production location of various product lines. After receiving the arbitrator's decision, Local 1985 filed the instant suit, asking this Court to vacate the decision.

## II.  LEGAL STANDARD

*A.  Arbitration Review*

Federal courts give "considerable deference to the arbitration process and to arbitration decisions themselves." *See United Paperworkers Int'l Union v. Misco, In*c., 484 U.S. 29, 36-38

Case No. 05-CV-2780
Gwin, J.

(1987); *see also DBM Techs. Inc. v. Local 227*, 257 F.3d 651, 656 (6th Cir. 2001) (noting that "the deference that federal courts must give to the settlement of a labor dispute by an arbitrator is substantial").  Courts generally may not review the merits of an arbitrator's award nor conduct a *de novo* proceeding.  *See United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960).  In *DBM Techs.*, the Sixth Circuit noted that:

> when a collective bargaining agreement provides for a private mechanism of arbitrating a dispute, "it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them."

257 F.3d at 656 (quoting *Misco*, 484 U.S. at 37-38).  In fact, the United States Court of Appeals for the Sixth Circuit has called review over such arbitration awards "one of the narrowest standards of judicial review in all of American jurisprudence." *Lattimer-Stevens Co. v. United Steelworkers of Am.*, 913 F.2d 1166, 1169 (6th Cir. 1990).  As described by the Supreme Court, so long as "an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that a court is convinced he committed serious error does not suffice to overturn his decision." *Major League Baseball Players Ass'n v. Garvey, 532* U.S. 504, 509 (2001) (internal quotation omitted); *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers*, 461 U.S. 757, 764 (1983) ("a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be a better one" and that a court is "not entitled to review the merits of the contract dispute").

*B.  Arbitration Vacation*

The Federal Arbitration Act ("FAA") permits parties to an arbitration to bring proceedings

-7-

Case No. 05-CV-2780
Gwin, J.

in a district court to enter judgment on the arbitration award or to vacate or modify the award.

Nevertheless, the law strictly curtails a district court's ability to modify or vacate an award.  The

FAA provides four grounds upon which the district court may vacate an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C.A. § 10(a).  In relevant part, subsection four provides that a court may vacate an arbitration

award if the arbitrator exceeds his or her powers.

With regard to this subsection, the Sixth Circuit has held that courts may vacate an

arbitration award if the award fails to draw its essence from the collective bargaining agreement and

is "merely the arbitrator's own brand of industrial justice[.]"  *DBM Techs.*, 257 F.3d at 656 (internal

quotations omitted); *see also United Steelworkers of Am. v. Enterprise Wheel & Car Corp.*, 363 U.S.

593, 596 (1960).  The Sixth Circuit has declared four ways that an arbitrator's award might fail to

draw its essence from the agreement:

> (1) an award conflicts with express terms of the collective bargaining agreement,
>
> (2) an award imposes additional requirements that are not expressly provided in the agreement,
>
> (3) an award is without rational support or cannot be rationally derived from the terms of the agreement, and

Case No. 05-CV-2780
Gwin, J.

(4) an award is based on general considerations of fairness and equity instead of the precise terms of the agreement.

*DBM Techs.*, 257 F.3d at 656 (quoting *Cement Divs., Nat'l Gypsum Co. v. Union Steelworkers of Am., ALF-CIO-CLC, Local 135*, 793 F.2d 759, 766 (6th Cir. 1986)).

An arbitration award survives the above test if "the arbitrator is even arguably construing or applying the contract and acting within the scope of authority . . . " *Misco*, 484 U.S. at 38. "It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *Enterprise Wheel & Car. Corp.*, 363 U.S. at 599.

### III. DISCUSSION

With its motion for summary judgment, Plaintiff Local 1985 first argues that this Court should engage in a *de novo* review of the dispute rather than a limited review of the arbitrator's decision. Next, the Plaintiff argues that even if a narrow standard of review applies, the Court should vacate Arbitrator Gerhart's decision on the basis that his award does not draw its essence from the contract. In contrast, Defendant Hoover argues that the Plaintiff fails to show any basis for this Court to vacate or modify the arbitrator's decision.

*A. Scope of Review*

Plaintiff Local 1985 argues that the Court is not bound by the typical standards governing the review of arbitration decisions and may engage in its own *de novo* review of Hoover's decision to relocate the Eagle line. The Plaintiff relies on two theories. First, the Plaintiff claims that under the terms of the CBA, the underlying grievance was not arbitrable and the arbitrator never should have rendered a decision on the merits. Next, the Plaintiff claims that even if the arbitrator had

Case No. 05-CV-2780
Gwin, J.

authority to decide the matter on the merits, the CBA allows any party claiming that an arbitrator's

decision has amended or modified the CBA to seek judicial interpretation of the terms at issue.  The

Court finds both arguments are not supported.

     1.  Was The Dispute Arbitrable?

     Paragraph 172 of the CBA states in relevant part, "Should any grievance be filed which, if

acceded to in whole or in part, would amend, modify, or change such Agreements, then such

grievance cannot be submitted to arbitration; provided, however, a dispute as to the arbitrability of

any such grievance may be submitted separately to arbitration."  Local 1985 now argues that the

underlying grievance should never have been submitted to arbitration because to find for Hoover,

the arbitrator needed to modify, amend, or change the 2003-2008 CBA.  In making this argument,

Local 1985 misinterprets the nature of the CBA's arbitration clause.

     According to the union's position, this clause would prevent arbitration anytime the parties

disagreed on the interpretation of a portion of the CBA, because either party could argue that if the

arbitrator would necessarily have to amend the contract in order to find that the opposing party's

interpretation of the contract was sound.   In other words, anytime parties offer differing

interpretations of contract language each party may believe that its interpretation is correct and that

any other interpretation would effectively amount to a modification of the contract.  However, to

suggest that paragraph 172 precludes arbitration anytime the parties offer competing interpretations

of contract language would nullify the arbitration agreement with regard to most if not all matters.

*See* Superior Prods. Co. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.,

Local No. 247, 42 Lab. Arb. Rep. (BNA) 517, 523 (1964) (Smith, Arb.) ("Arbitrators are constantly

required and expected to give meaning to contract provisions which are unclear, in situations which

Case No. 05-CV-2780
Gwin, J.

were not specifically foreseen by the contract negotiators. So long as this is done by application of principles reasonably drawn from the provisions of the Agreement, and not by treating of a subject not covered at all by the Agreement, arbitral authority is not being improperly assumed.").

Generally, when parties enter into arbitration agreements such as the agreement at issue here, the parties agree to arbitrate certain categories or types of disputes. In this case, the Court finds that paragraph 172 merely clarifies the parties' intention that the arbitration agreement only apply to rights arbitration disputes as opposed to claims involving interest arbitration disputes. The United States Supreme Court described the fundamental difference between interest arbitration and rights arbitration in the following manner:

> The first [interest arbitration] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.
> The second class [rights arbitration], however, contemplates the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. In the latter event the claim is founded upon some incident of the employment relation, or asserted one, independent of those covered by the collective agreement, e.g., claims on account of personal injuries. In either case the claim is to rights accrued, not merely to have new ones created for the future.

*Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945).

Paragraph 172 of the CBA essentially limits the scope of the arbitration clause to rights disputes. As Arbitrator Gerhart pointed out,

> It is axiomatic that no "rights" arbitrator has the prerogative to modify or amend a mutually negotiated unambiguous collective bargaining agreement. Even where an agreement is silent with respect to such limitations, an arbitrator has no such

-11-

Case No. 05-CV-2780
Gwin, J.

> authority.  The arbitrator's role . . . is to be the parties' official contract "reader" –
> "the arbitrator's mandate is plain: Tell the parties (and the courts) what the contract
> means."

(Award and Decision of Arbitrator Paul F. Gerhart, Nov. 21, 2005 at 47, citing Theodore J. St. Antoine, *Judicial Review of Labor Arbitration Awards: A Second Look at Enterprise Wheel and Its Progeny*, 75 MICH. L. REV. 1137 (1977).)  *See also Enterprise Wheel & Car Corp.*, 363 U.S. at 597 ("[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement.").

In the instant case, the parties presented the arbitrator with a final agreement, the 2003-2008 CBA, and a dispute as to what the precise terms of that agreement meant with regard to the continuing effect of the May 16, 2001, Letter of Understanding.  This is a prime example of rights arbitration and as such falls squarely within the scope of the parties' arbitration agreement.  The arbitrator's sole job was to read and interpret the contract based on general principles of contract interpretation.  Plaintiff Local 1985 made no objection before the arbitrator to the arbitrability of the grievance.  The arbitrator's authority has not changed simply because Local 1985 now disagrees with the arbitrator's ultimate decision.  Accordingly, the Court finds that Local 1985's grievance was arbitrable.

2.  Did the Parties Contract for *De Novo* Review?

Plaintiff Local 1985 next argues that the parties contracted for broader judicial review in the event that either party believed the arbitrator had amended or modified the CBA.  The Plaintiff relies primarily on the following language from the CBA: "When an arbitrator's decision is claimed to amend, modify, or change the terms of said Agreement, Sub-Agreement, or Supplement, then either party may seek judicial interpretation thereof with respect to such issue."  (CBA at ¶ 172, Joint Ex.

-12-

Case No. 05-CV-2780
Gwin, J.

2 at 729A.)  According to the Plaintiff, this paragraph confers jurisdiction upon a district court to substitute its own interpretation of the CBA for that of the arbitrator if either party claims the arbitrator amended or modified the CBA.  In other words, the Court would not be bound by the FAA's deferential standard.

Defendant Hoover argues that even if the parties can contractually expand the Court's scope of review,[2] the language the Plaintiff cites does not amount to such an agreement.  According to

_____

[2] The parties dispute whether or not they can lawfully contract for a broader standard of review than that which the Congress set forth in the FAA, 9 U.S.C.A. § 10 (a).  The Supreme Court has not addressed this issue nor has the Sixth Circuit.  In a related decision, the United States Supreme Court held that "Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted."  *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 479 (1989) (internal citations omitted).

The circuit courts generally recognize that under *Volt*, parties can through private agreement supercede the FAA's default rules governing the arbitration itself.  *See Kyocera Corp. v. Prudential-Bache Trade Services, Inc.*, 341 F.3d 987, 999 (9th Cir. 2003).  However, the circuits are split as to whether or not to extend the *Volt* Court's ruling to allow parties to contract for an expanded standard of judicial review.  The First, Third, Fourth, and Fifth Circuits explicitly hold that the FAA does not preclude parties from contracting for a broader standard of review.  *See Puerto Rico Telephone Co., Inc. v. U.S. Phone Mfg. Corp.*, 427 F.3d 21, 31 (1st Cir. 2005) (We agree with the other circuits that have concluded that the parties can by contract displace the FAA standard of review, but that displacement can be achieved only by clear contractual language."); *Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 293 (3d Cir. 2001) (holding that while arbitration agreements remain subject to the FAA, "parties may opt out of the FAA's off-the-rack vacatur standards and fashion their own (including by referencing state law standards)"); *Syncor Int'l Corp. v. McLeland*, No. 96-2261, 1997 WL 452245, *6-7 (4th Cir. Aug. 11, 1997) (recognizing and enforcing a contract provision permitting expanded review of the arbitration award by the federal courts); *Gateway Techs., Inc. v. MCI Telecomms. Corp.*, 64 F.3d 993 (5th Cir.1995) ("Because these parties contractually agreed to expand judicial review, their contractual provision supplements the FAA's default standard of review and allows for *de novo* review of issues of law embodied in the arbitration award.").

In contrast, the Seventh, Ninth, and Tenth Circuits hold that the FAA sets the standard of review for federal courts and private parties cannot contract for a different standard.  *See Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1504-05 (7th Cir. 1991) (stating that private parties "cannot contract for judicial review of [arbitration] award[s]; federal jurisdiction cannot be created by contract"); *Kyocera Corp. v. Prudential-Bache Trade Services, Inc.*, 341 F.3d 987, 1000 (9th Cir. 2003) ("Private parties' freedom to fashion their own arbitration process has no bearing whatsoever on their inability to amend the statutorily prescribed standards governing federal court review."); *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 933 (10th Cir. 2001) (holding that parties may not contract for expanded judicial review of arbitration awards because "[c]ontractually expanded standards, particularly those that allow for factual review, clearly threaten to undermine the independence of the arbitration process and dilute the finality of arbitration awards").  Though never directly holding as such, the Eighth Circuit suggested that the FAA precludes parties from agreeing to an alternate standard of review.  *UHC Management Co., Inc. v. Computer Sciences Corp.*, 148 F.3d 992, 998 (8th Cir. 1998).

The Sixth Circuit has yet to address the specific issue of whether parties can contract for a broader standard of review of arbitration awards.  However, in a different context it stated that parties "cannot determine this court's standard

(continued...)

-13-

Case No. 05-CV-2780
Gwin, J.

Hoover, paragraph 172 does nothing more than allow a party to "seek judicial interpretation" of the disputed terms specifically to determine whether the arbitrator amended, modified, or changed the terms of the agreement.  Indeed, the Court finds that paragraph 172 of the CBA does not allow the Court to supplant its own interpretation of the CBA.  If paragraph 172 stated only that "[w]hen an arbitrator's decision is claimed to amend, modify, or change the terms of said Agreement, Sub-Agreement, or Supplement, then either party may seek judicial interpretation thereof," the Plaintiff's position would have more force.  However, the parties significantly limited that language by specifying that "either party may seek judicial interpretation thereof *with respect to such issue*." (CBA at ¶ 172, Joint Ex. 2 at 729A.)

Reading that sentence as a whole, the Court finds that it merely authorizes the Court to vacate the arbitrator's decision if, upon its own interpretation of the CBA, it determines that the arbitrator modified, amended, or changed the terms of the CBA.  The practical effect therefore differs little from the Sixth Circuit's interpretation of the FAA.  As described above, the Sixth Circuit allows a district court to vacate an arbitration award where it conflicts with the terms of the agreement, is not rationally supported by or derived from the agreement, imposes requirements not expressly provided for in the agreement, or is based on factors other than the express terms of the agreement.  *See DBM Techs*., 257 F.3d at 656.

In any event, as discussed below, the Court finds that Arbitrator Gerhart's interpretation of

---

[2](...continued)
of review by agreement. Such a determination remains for this court to make for itself."  *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996).  While this issue may be a determinative factor in some cases, in the instant case it is not.  As discussed below, this Court finds Arbitrator Gerhart's decision to be sufficiently consistent with the language of the 2003-2008 CBA.  Even if this Court were to apply a broader standard of review than the standard set forth in the FAA, it would reach the same conclusion.  Therefore, the Court need not speculate at this point as to how the Sixth Circuit will rule with regard to the issue of whether parties can contractually alter the standard of review of arbitration awards.

-14-

Case No. 05-CV-2780
Gwin, J.

the CBA is sufficiently consistent with the terms of that contract and does not sufficiently modify or amend those terms.

*B. The Arbitration Award Draws its Essence from the 2003-2008 CBA*

Having resolved the issues related to the scope of judicial review, the Court now reviews the merits of the arbitration award. The parties' central dispute involves the effect of the May 16, 2001, Letter of Understanding. Relying on the parties' omission to expressly delete this letter, the Plaintiff claims that it was integrated into the 2003-2008 CBA through the 2003 Settlement Contract's statement that "All other provisions of the June 5, 2000 Labor Agreement remain in force." Accordingly, the Plaintiff maintains that the terms of the 2003 CBA include the express guarantee that Hoover will continue production of the Eagle line in North Canton, as stated in the 2001 Letter of Understanding. Extending this line of reasoning to its logical conclusion, the Plaintiff argues that the arbitrator could not have found that the 2003 CBA effectively nullified the portion of the May 16, 2001, Letter of Understanding addressing Eagle Steam Vac production without changing or modifying the terms of the contract.

Therefore, the Plaintiff now asks this Court to vacate the arbitration award, arguing that it conflicts with the express terms of the CBA and that the arbitrator impermissibly based his decision on factors other than the precise terms of the contract.

1. Is the Arbitration Award Sufficiently Consistent With the Terms of the 2003 CBA?

To decide whether the arbitrator's decision "draws its essence" from the Agreement, this Court considers "whether the language of the contract at hand is sufficiently clear so as to deny the arbitrator the authority to interpret the agreement as he did." *Bruce Hardwood Floors v. Southern Council of Indus. Workers*, 8 F.3d 1104, 1108 (6th Cir. 1993) (citation omitted). As stated above,

-15-

Case No. 05-CV-2780
Gwin, J.

this Court lacks the authority to engage in a *de novo* review of the disputed contract language.  The

Court must instead decide if the arbitrator's decision fails to draw its essence from the collective

bargaining agreement, that is whether the arbitrator's decision is without rational support or cannot

be rationally derived from the terms of the agreement.  In the face of this narrow standard of review,

the Plaintiff maintains that there is no possible reading of the CBA that would support the arbitrator's

decision.  This Court finds otherwise.

    With his decision, the arbitrator concluded that the 2003 Agreement ended the contractual

obligation to maintain the Eagle line at the North Canton location.  First, the arbitrator noted that

*until* the 2003 negotiations, Hoover and Local 1985 operated under a job security scheme structured

around Hoover's guaranty to  make certain product lines in the North Canton facilities.  Reading the

May 16, 2001, Letter of Understanding in the context of this scheme, the arbitrator concluded that

Hoover's commitment to produce the Eagle line at the North Canton facilities was not a stand-alone

agreement. (Letter of Understanding, May 16, 2001, Union Ex. A at 807.)  Instead, language in the

letter, such as the clause stating that Hoover would "commit the production of Eagle I and Eagle II

to Memorandum Agreement 1, Exhibit 28, Job Security," suggested to the arbitrator that the Letter

of Understanding was merely a mid-term amendment to the Job Security Agreement, adding the

Eagle Steam Vac to the existing list of protected or secure product lines.

    Turning to the 2003 negotiations, the arbitrator examined a variety of evidentiary sources

to ascertain the parties' intentions.  For example, the arbitrator considered evidence that, when

viewed in isolation, supports the Plaintiff's view.  First, Hoover and Local 1983 did not explicitly

delete the May 16, 2001, Letter of Understanding despite a consistent practice of carefully deleting

past provisions that the parties agreed would not be continued into new agreements.  Second, the

-16-

Case No. 05-CV-2780
Gwin, J.

arbitrator considered that in a September 22, 2004, Letter of Understanding that resolved a

grievance, the parties stated that the May 16, 2001 agreement remained valid.  The arbitrator

additionally considered Local 1985's argument that in the 2003 negotiations, Hoover's president,

Tom Briattico expressed his intent to continue to produce "high-end" products in North Canton,

Ohio.

Ultimately, in balancing this evidence with other evidence of the parties' intentions and

bargaining history, the arbitrator found greater support for the conclusion that the revised 2003 Job

Security Agreement nullified the language in the May 16, 2001, Letter of Understanding dealing

with the Eagle Steam Vac line.  In reaching this conclusion, the arbitrator focused heavily on the

parties 2003 negotiating history and upon the language incorporated into the 2003 Job Security

Agreement.  First, the arbitrator noted that the 2003 Job Security Agreement was entirely changed

from previous agreements.  The arbitrator characterized the change as an overall shift in strategy

"from one based on identifying particular products to be produced at North Canton to one based on

guaranteeing a minimum level of employment at the Company's North Canton facilities." (Award

and Decision of Arbitrator Paul F. Gerhart, Nov. 21, 2005 at 51.)  Because the provisions of the May

16, 2001 Letter of Understanding regarding production of the Eagle line were inextricably tied to

the old job security paradigm, the 2003 revised Job Security Agreement necessarily nullified those

provisions.     Second, the arbitrator pointed to evidence that the Hoover intended to trade its

agreement to maintain a minimum level of employment in return for greater flexibility regarding

production location matters.  This goal was so important to Hoover, that it was unwilling to agree

to any proposals requiring it to produce certain products in North Canton as well as maintain

minimum employment levels.  For example, during the 2003 negotiations, Local 1985 proposed a

-17-

Case No. 05-CV-2780
Gwin, J.

job security agreement that included a guarantee to continue producing Steam-Vac products in North

Canton in addition to a guarantee of a minimum number of employees.  Hoover rejected this

proposal, indicating that the company would not agree to both obligations.  In light of this evidence,

the arbitrator concluded that the union's "assertion that the parties mutually intended to eliminate

the protected product list except for the Eagle [line] is simply not credible."  (Award and Decision

of Arbitrator Paul F. Gerhart, Nov. 21, 2005 at 52.)

      The Plaintiff now contends that the arbitrator's decision was inconsistent with the express

terms of the CBA.  Specifically, the Plaintiff claims that the arbitrator erred in finding that the 2003

agreement nullified the portion of the 2001 Letter of Understanding requiring Hoover to

manufacture the Eagle Steam Vac line in North Canton because: (1) the only way to change any

portion of the 2001 Letter of Understanding was to expressly delete or modify that portion of the

letter; (2) the 2003 agreement that memorialized the results of the parties' negotiations expressly

stated that "[a]ll other provisions of the June 5, 2000 labor agreement remain in force;" (3) the

parties' conduct during the 2003 negotiations evinces an intent to continue producing high end

products, such as the Eagle Steam Vac in North Canton; and (4) a September 22, 2004, Letter of

Understanding reaffirms the parties' intent that the 2001 Letter of Understanding remain valid in its

entirety.

      Beginning with the Plaintiff's first argument, the Court finds sufficient evidence to support

the arbitrator's conclusion that express deletion was not the only method by which the parties could

amend or delete portions of supplemental agreements like Letters of Understanding.  While the

arbitrator credited testimony regarding the past practice of the parties, the arbitrator also had before

him express language from the CBA addressing the methods available for modifying supplemental

-18-

Case No. 05-CV-2780
Gwin, J.

agreements. Specifically, the CBA instructs that "[a]ny Sub-Agreements which may be, or have been executed between the parties will be continued to the extent that they are not altered, either in their own provisions, by the provisions of this Agreement, or by mutual agreement." (CBA at ¶ 198, Joint Ex. 2 at 732A.)   According to this clause, express deletion is only one way to amend a prior supplemental agreement.

The arbitrator also considered evidence that in 2003, the parties did not discuss each and every supplemental agreement during the 2003 negotiations.  This suggests that, regardless of how the parties previously dealt with supplemental agreements during negotiations, they did not deal with them in the same manner during the 2003 negotiations.

Therefore, while another arbitrator may have attributed greater weight to evidence of the parties' past practice, the Court finds that the arbitrator could find sufficient evidence, especially the contract language itself, to overcome the parties past practice of explicitly dealing with sub-agreements. *See also Beacon Journal Publ'g Co. v. Akron Newspaper Guild*, 114 F.3d 596, 601 (6th Cir. 1997) ("[P]ast practice or custom should not be used to interpret or give meaning to a provision or clause of the collective bargaining agreement that is clear and unambiguous."); *Omnisource Corp. v. United Steelworkers of America*, No. 98-3603, 1999 WL 552600, at *2 (6th Cir. July 26, 1999) (holding that where the CBA's terms are clear, the court must enforce those terms even where the company engaged in a contrary practice for a number of years); *Edwards v. United Parcel Service, Inc.*, Nos. 02-6080, 02-6145, 2004 WL 1152175 (6th Cir. May 19, 2004) ("Past practice or custom cannot trump clear and unambiguous terms of a CBA.").  In deciding this, the arbitrator used the express language of the CBA.

Turning next to the Plaintiff's second argument, the Court finds similar support for the

Case No. 05-CV-2780
Gwin, J.

arbitrator's decision that the statement in the 2003 Agreement that "[a]ll other provisions of the June 5, 2000 labor agreement remain in force" was not controlling.  If the parties can implicitly modify or delete Letters of Understanding through later revisions to the CBA, then that statement merely means that all provisions of the 2000 version of the CBA remain in effect to the extent they were not explicitly or implicitly altered by the 2003 revisions.

With this in mind, the arbitrator then focused on what he concluded to be the truest indication of the parties intent with regard to the May 16, 2001, Letter of Understanding – the parties' bargaining history and the total shift that occurred in 2003 from securing jobs based on certain product line guarantees to securing jobs based on minimum workforce guarantees.  This brings the Court to the Plaintiff's third argument, that the arbitrator ignored evidence that during the 2003 negotiations, Hoover's president expressed an intent to continue to manufacture high-end products in North Canton.  As noted above, the arbitrator did consider this fact.  However, the arbitrator examined this evidence but ultimately concluded that regardless of any suggestions that Hoover's president made about the company's goal, "there was no explicit exception in the Agreement or Exhibit #28 [the Job Security Agreement] in particular that would protect any product and no explicit promise written or verbal to that effect either."  (Award and Decision of Arbitrator Paul F. Gerhart, Nov. 21, 2005 at 52.)

Although Hoover's President made non-specific comments that Hoover intended to keep high-end products in North Canton, these comments does not defeat other evidence that the arbitrator relied upon when he found the parties intended to lift any obligation to manufacture certain product lines in North Canton in return for the company's guarantee that it would employ a minimum number of employees.  As discussed above, the extreme difference between the revised

-20-

Case No. 05-CV-2780
Gwin, J.

2003 Job Security Agreement and the previous Job Security Agreements provide support for the arbitrator's conclusion.  Most important, the inclusion in the agreement of language giving Hoover the right to "discontinue products, parts, and processes, . . . or . . . transfer the manufacturing of products, parts, and sub-assemblies between its production facilities and/or certified suppliers provided the minimum guarantee of bargaining unit jobs is met" supported the arbitrator's finding. (Memorandum Agreement 1, Exhibit 28, Job Security Dec. 1, 2003, Joint Ex. 9 at 761.)

Additionally, during the 2003 negotiations, the union proposed a Job Security provision that contained both a guarantee to maintain a minimum number of employees and a guarantee to continue manufacturing Steam Vac products in North Canton.  Hoover rejected this proposal and the final revised version of the Job Security Agreement contained no promise to manufacture certain products in the North Canton facilities.  To the contrary, the 2003 CBA expressly permitted the company to transfer product lines to other facilities.  This bargaining history, especially since it accords with the contract language, provides support for the arbitrator's decision.

Finally, with regard to the Plaintiff's fourth argument, Local 1985 points to a September 22, 2004, Letter of Understanding that settled a grievance related to the issue of product returns.  The 2004 Letter of Understanding that specifically referenced the 2001 Letter of Understanding, stating, "The Letter of Understanding dated May 16, 2001 which addresses the agreement between the parties concerning Product Returns in Item No. 4 shall remain in effect."  (Company Ex. 18 at 954.) Addressing this letter, the arbitrator found that it dealt specifically with a grievance involving product returns – a subject the parties did not touch upon in either the 2003 negotiations or Settlement Contract.  Therefore, the arbitrator concluded that even though the 2004 Letter of Understanding stated that the May 16, 2001, Letter of Understanding remained valid, it did not mean

-21-

Case No. 05-CV-2780
Gwin, J.

that every term of that Letter of Understanding also remains in effect.  Instead, only the 2004 letter

dealt with only those terms of the 2001 letter that were not implicitly altered or deleted during the

2003 negotiations.  The Court finds that though alternate interpretations of the 2004 Letter of

Understanding are conceivable, Arbitrator Gerhart's interpretation has support.  Local 1985

maintains that if the parties intended the 2004 Letter of Understanding to deal only with product

returns they would have included a limiting clause such as "only Item 4 of the Letter of

Understanding dated May 16, 2001 shall remain in effect."  However, the omission of such a

limiting clause does not defeat the arbitrator's conclusion that the  revised 2003 Job Security

Agreement had already nullified certain portions of the May 16, 2001, Letter of Understanding.  The

arbitrator read the 2003 negotiations as having removed any guarantee that specific product lines

would remain in North Canton.  If product line guarantees had earlier been removed by the 2003

Contract, the 2004 Letter of Understanding's reference to the May 16, 2001, Letter of Understanding

is not inconsistent.

Viewing all of the evidence that the union relies on as a whole, it is insufficient to contradict

the unequivocal language of the 2003 Job Security Agreement granting Hoover the right to "transfer

the manufacturing of products, parts and sub-assemblies between its production facilities and/or

certified suppliers provided the minimum guarantee of bargaining unit jobs is met."  (Memorandum

Agreement 1, Exhibit 28, Job Security Dec. 1, 2003, Joint Ex. 9 at 761.)  Local 1085 agreed to that

concession in order to secure Hoover's commitment to maintain a minimum level of employees

during the term of the CBA.

Evidence of the 2003 negotiations shows that Hoover was fairly clear about its intent to

secure greater flexibility to relocate certain product lines to other facilities.  As discussed above,

Case No. 05-CV-2780
Gwin, J.

Hoover explicitly rejected at least one union proposal that would have obligated the company to continue production of the Eagle line in North Canton. *See U.S. Postal Serv. v. Am. Postal Workers Union, AFL-CIO*, 204 F.3d 523, 530 (4th Cir. 2000) (stating that a party may not "gain through arbitration what it could not acquire through negotiation"); FRANK ELKOURI & EDNA A. ELKOURI, HOW ARBITRATION WORKS 454 (6th ed. 2003) ("If a party attempts, but fails, in contract negotiations, to include a specific provision in the agreement, arbitrators will hesitate to read such provision into the agreement through the process of interpretation."); *City of Columbus v. Fraternal Order of Police, Capital City Lodge No. 9*, 102 Lab. Arb. Rep. (BNA) 477, 480 (1994) (Kindig, Arb.) (citing as persuasive evidence against the union's position the fact that the union proposed a similar provision during negotiations for the applicable agreement and the city rejected the proposal); *Progress-Bulletin Publishing Co. v. Los Angeles Web Pressmen's Union No. 18, Int'l Printing Pressmen & Assistants Union of N. Am.*, 47 Lab. Arb. Rep. (BNA) 1075, 1077 (1966) (Jones, Jr., Levin, Whaley, Edwards, & Nevins, Arbs.) ("Normally, of course, the plain inference of the omission [of proposed language] is that the intent to reject prevailed over the intent to include."). Local 1985 offers no explanation for why Hoover would refuse to accept such language if it intended, as the union suggests, the 2001 agreement to produce the Eagle line in North Canton to remain in force. *Cf. Harry W. Applegate, Inc. v. Stature Electric, Inc.*, 275 F.3d 486, 489 (6th Cir. 2001) (holding that the defendant's rejection of a proposed clause involving post-termination commissions during contract negotiations provided evidence that the final agreed-upon contract did not provide for post-termination commissions).

The fact that the Plaintiff interprets the evidence in this case differently is of little consequence. It is not the role of this Court, in reviewing the arbitration award, to weigh competing

Case No. 05-CV-2780
Gwin, J.

interpretations of the contract language.  Accordingly, the Court finds that the Plaintiff fails to demonstrate that the arbitration award conflicts with the express terms of the contract or modifies or amends the contract.  Contrary to Local 1985's assertions, the arbitrator's decision is sufficiently consistent with the terms of the 2003 CBA.  The Court recognizes that ambiguities exist with regard to the terms of the CBA and that different interpretations of the contract language are possible.  However, in agreeing to submit such disputes to arbitration, the parties entrusted the arbitrator with the task of resolving those ambiguities and bound themselves to his interpretation of the contract as long as the arbitrator's decision draws its essence from the terms of the contract.

2.  Did the Arbitrator Err in Considering Matters Outside of the 2003 CBA?

Local 1985 next argues that the arbitrator improperly based his decision on matters outside of the 2003 CBA.  Specifically, Local 1985 claims that the arbitrator erred when he considered parol evidence related to the 2003 negotiations, including proposals and other statements that the parties made during negotiations as well as evidence of the parties' goals and strategies.  According to the union, the arbitrator lacked authority to examine the context surrounding the 2003 revisions to the CBA because the terms of the 2003 CBA clearly and unambiguously precludes the union from transferring production of the Eagle line.

At the outset, the Court notes that unless the arbitrator's consideration of parol evidence is so egregious an error as to result in a decision that did not draw its essence from the terms of the contract, this Court cannot vacate the award on that basis alone.  *See Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) ("We recently reiterated that if an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.")

-24-

Case No. 05-CV-2780
Gwin, J.

(internal citations omitted).  Moreover, it is well-settled that an arbitrator may "look for guidance from many sources, [and] his award is legitimate . . . so long as it draws its essence from the collective bargaining agreement." *Enterprise Wheel & Car Corp.*, 363 U.S. at 597.  *See also Local 1199, Drug, Hosp. & Health Care Employees*, 956 F.2d 22, 25 (2nd Cir. 1992) (noting that "in interpreting a collective bargaining agreement, an arbitrator may not even be bound by the common law contract parol evidence rule," though the arbitrator cannot rely on such evidence to "directly contradicts the express language of the collective bargaining agreement") (internal citations omitted).

That said, the Court finds that the arbitrator's examination of the context surrounding negotiations for the 2003 CBA was consistent with common law parol evidence standards.  Contrary to the Plaintiff's repeated assertion that the 2003 CBA unambiguously prohibits Hoover from transferring the Eagle line, both the arbitrator and this Court found the CBA to be somewhat ambiguous.  To ascertain the intent of the parties in light of these ambiguities, the arbitrator focused primarily on the general history of negotiations between the party, analyzing their treatment of the job security issue from the mid-1980s through the current CBA.  Well-settled  rules of contract interpretation permit the arbitrator to consider the general context and other extrinsic evidence in order to resolve ambiguities in a contract.  *See Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 219, 797 N.E.2d 1256, 1261 (Ohio 2003) ("[W]here a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent."); *Local 783, Allied Indus. Workers of America, AFL-CIO v. General Elec. Co.*, 471 F.2d 751, 757 (6th Cir. 1973) (quoting *Tennessee Consolidated Coal Co. v. United Mine Workers of Am.*, 416 F.2d 1192, 1198 (6th Cir. 1969)) ("After a finding of ambiguity has been made, '[e]vidence of the surrounding circumstances and the practical

-25-

Case No. 05-CV-2780
Gwin, J.

construction of the parties is admissible to aid in its interpretation.'"); *Manville Forest Prods. Corp.*

*v. United Paperworkers*, 831 F.2d 72 (5th Cir. 1987) ("In short, the precedents clearly support using

past practice and negotiating history to resolve ambiguities and gaps in written collective bargaining

agreements.").

      3.  Did the Arbitrator Base His Decision On His Own View of Industrial Justice?

      Turning to Local 1983's final argument, the union claims that the arbitrator did not base his

decision on the precise terms of the contract, but rather on his own brand of "industrial justice." *See*

*Enterprise Wheel & Car Corp.*, 363 U.S. at 597 ("an arbitrator is confined to interpretation and

application of the collective bargaining agreement; he does not sit to dispense his own brand of

industrial justice").  In support of this argument, Local 1985 relies primarily on a few statements the

arbitrator made near the end of his decision regarding Hoover's position within the global economy.

According to Local 1985, these comments show that the arbitrator ignored evidence that Hoover

made an oral commitment to produce high-end products, such as the Eagle Steam Vac line, in North

Canton and instead rendered a decision based on his own notions of fairness and equity.

      In those statements, the arbitrator did mention the possible effect of free trade on Hoover's

decision to transfer production of the Eagle line, but he did so only as an aside:

> The arbitrator has carefully considered the evidence adduced by the Union
> concerning the harmonious working relationship that developed between it and
> former President Thomas Briattico during his short tenure as president in 2003.  The
> pattern evidenced at Hoover is not unique but has afflicted manufacturing throughout
> Northeast Ohio, indeed the Midwest.  There is no doubt, in the arbitrator's view, that
> Mr. Briattico was sincere in his efforts to develop a strategy that would fulfill the
> commitment he and Jim Repace expressed in the letter to the employees dated
> September 5, 2003: "Together, we are committed to an all-out effort to save jobs in
> North Canton, and we know you share that desire."
>
> Notwithstanding such commitments to work toward saving jobs, the
> arbitrator finds no contractual commitment on the part of the Company to maintain

-26-

Case No. 05-CV-2780
Gwin, J.

> the production of any particular product in North Canton.  Unfortunately, the
> economic reality of free trade in a global economy undermines even the most sincere
> efforts to protect or secure jobs in any particular location or company.

(Award and Decision of Arbitrator Paul F. Gerhart, Nov. 21, 2005 at 54.)

Taken as a whole, the arbitrator's decision shows that he first and foremost focused on the express language of the 2003 CBA.  Then, in order to resolve ambiguities, the arbitrator considered extrinsic evidence, including Hoover's alleged statements during the 2003 negotiations regarding its intention that the North Canton facility continue to produce high-end products.  However, the arbitrator ultimately found, as discussed above, that these statements did not amount to a binding commitment.  As the arbitrator noted, the revised 2003 Job Security Agreement states nothing about a promise to produce high end products in North Canton.  Quite the opposite, the arbitrator received evidence that the agreement explicitly gave Hoover the authority to transfer the manufacturing of any product line as long as the company retains a minimum number of jobs.

As discussed above, the arbitrator's refusal to read into the contract an additional obligation that would effectively nullify this explicit language was based on a careful consideration of the contract language in light of relevant extrinsic evidence.  Therefore, the Court finds that the arbitrator based his decision on an evaluation of the evidence, rather than on his own view of industrial justice as the union suggests.

Although Local 1985 makes plausible arguments, its position unravels in the face of the 2003 Job Security Agreement.  The language of this agreement is precise and unwavering, leaving little room to believe that the parties agreed to require Hoover  to continue to produce certain product lines in North Canton.  To the contrary, the 2003 agreement explicitly grants Hoover the flexibility to relocate production as it sees fit.  The sole restriction placed on this authority is that Hoover

-27-

Case No. 05-CV-2780
Gwin, J.

designate sufficient work to the North Canton facilities in order to continue to employ a minimum

number of workers.  Though Local 1985 continues to interpret this evidence differently from the

arbitrator, the Court finds that the evidence as a whole sufficiently supports the arbitrator's

conclusion.

### IV.  CONCLUSION

For the reasons stated above, the Court finds that Arbitrator Gerhart's decision is sufficiently

consistent with the terms of the parties' CBA.  The Court therefore **GRANTS** Defendant Hoover's

motion for summary judgment and **DENIES** Plaintiff Local 1985's request to vacate or modify the

arbitration award.  The Court therefore **CONFIRMS** the arbitration opinion and award.

IT IS SO ORDERED.


Dated: July 5, 2006                                    s/          *James S. Gwin*
                                                       JAMES S. GWIN
                                                       UNITED STATES DISTRICT JUDGE